914 A.2d 770

RIVER WALK APARTMENTS, LLC, et al.

v.

Roger TWIGG, et al.

No. 49, Sept. Term, 2006.

Court of Appeals of Maryland.

Jan. 10, 2007.

Jeffrey H. Scherr (Philip M. Andrews, Thomas M. Nanni, Kramon & Graham, P.A., Baltimore, on brief), for petitioners.

Kurt J. Fischer (Marta D. Harting, DLA Piper US LLP, Baltimore, Saundra Nickols, City Atty., City of Frederick, on brief), for respondents.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J.

The Petitioners, River Walk Apartments, LLC, and Monocacy River Apartments, LLC, ("River Walk") seek review of the Court of Special Appeals's judgment which reversed sum-

mary judgment entered by the Circuit Court for Frederick County on behalf of River Walk, directing Respondent, Roger Twigg, in his official capacity as the Director of Permits and/or Building Department Manager of the City of Frederick, to issue certain shell construction permits for 144 units, a club house, two garage buildings, and twelve buildings, in connection with the development of the Riverside Corporate Park. We granted certiorari, *River Walk v. Twigg,* 394 Md. 307, 905 A.2d 842 (2006), to consider one question:

> Was the City of Frederick free to exercise its executive discretion—pursuant to Article 23A of the Maryland Code, the City Charter, and its common law right to enter into and be bound by contracts pursuant to this Court's decisions—to purchase valuable rights-of-way necessary to complete a preexisting public project, without seeking legislative approval by ordinance?

We shall hold that two contracts, a November Agreement and a Deferral Agreement, entered into by two different mayors of the City of Frederick, were not legislatively authorized and therefore, are unenforceable.

## I. Facts

In November, 1999, J And R Limited Partnership contracted to sell to the Millennium Development Group, LLC, approximately 122 acres of property formerly known as the "South Rosenstock Farm," located in the City of Frederick and encompassing Gas House Pike from its intersection with Monocacy Boulevard and running to the City's eastern limits. This piece of property had been annexed by the City of Frederick by Resolution Number 6–85, passed by the Mayor and Board of Aldermen ("Aldermen") in 1985, and which required the following two conditions in exchange for becoming part of the municipality:

1. The owner of the land to be annexed shall pay the cost of any required advertising of this annexation matter.

2. Extension of water, sanitary sewer and storm drain lines, streets, curbs, lighting and all other public improvements to and into the area to be annexed shall be at the

expense of the owner or owners or developers requesting same and shall not be at any cost to the City.

City of Frederick, Resolution No. 6–85.

One month after entering into the contract for the purchase of the property with J And

R Limited Partnership, Millennium assigned all of its rights in the South Rosenstock Farm property to Riverside Investment Group, LLC, which procured the property to incorporate it into the Riverside Corporate Park Project. The property was to constitute the "South Campus," as one of four campuses—the North, South, East and West—of the development plan for the Corporate Park in the City of Frederick.[1] The South Campus was to surround Gas House Pike, which was a vital part of the Extension of Monocacy Boulevard Project, a project which entailed the completion of Monocacy Boulevard from its intersection with Gas House Pike to its southern end point at Hughes Ford Road, as well as the upgrade of Gas House Pike from its intersection with Monocacy Boulevard to its terminus at the eastern corporate limits of the City.

On November 6, 2000, to "commence and complete" Phase III of the Monocacy Boulevard Project, its final phase, the Mayor of the City of Frederick entered into an agreement (the "November Agreement") with Riverside Investment Group, LLC, Riverside Industrial Properties, LLC, Riverside Technology Park I, LLC, Riverside Technology Park II, LLC, and Riverside Technology Park III, LLC ("Property Owners"). Pivotal to the contract was the Property Owners' agreement to dedicate to the City for no charge "any and all additional rights-of-way needed for the upgrade and widening of Gas House Pike along the frontage of the Property," which was to be made "free and clear of all liens and/or encumbrance

---

1. The South Campus is referred to in the Preliminary Subdivision Plan of the Riverside Corporate Park Project as plan number PC# 03–167PSU, and in the Final Plan as Lots 301, 302, Outlot "G," and Outlot "H."

s," [2] for which the Property Owners agreed to record the plats to be dedicated and execute all documents necessary for its completion. The Property Owners also agreed to give their consent, and sign all necessary documents to subject the properties to a "Tax Increment Financing District" (TIF) to enable the City to finance the completion of Monocacy Boulevard, with the caveat that "Property Owner shall have no additional tax assessment or liability as a result of the creation of the [TIF]."

In consideration for the Property Owners' dedications and agreement to the TIF, the contract provided that the Properties and Property Owners would be subject to a "deferred contribution special assessment" of $1.00 per square foot of each building to be constructed, to be paid once to the City "upon application to the City for the Shell Construction Permit for such building." The Agreement stated that "no additional fee for the special assessment shall be assessed or contribution required in conjunction with future permits for the same building," nor would the Property be subject to additional "impact fees" [3] as "a condition of development of and/or construction of improvements on the Property."

---

2. According to the November Agreement, the City had already obtained from the property owners of the North Campus of the corporate office park, formerly known as the "North Rosenstock Farm," all rights-of-way needed to complete Phase III. The November Agreement, therefore, sought to obtain from the South Campus owners "the same distance from the center line of said road as presently dedicated by record plat along the frontage of the North Rosenstock Farm." It is unclear from the language of this Agreement and from the record, however, whether the rights-of-way were conveyed in fee simple or whether they merely encumbered the land with a thoroughfare for the use of the public.

3. An impact fee is a fee typically levied by local governments "upon development in order to help finance the cost of improvements such as roads, water and sewer systems, parks, schools, police and fire stations and low and moderate income housing generated, at least in part, by that development." 8 Eugene McQuillin, *The Law of Municipal Corporations* § 25.118.50, p. 381 (3rd. ed.2000). It is a type of exaction. *City of Annapolis v. Waterman*, 357 Md. 484, 523–24, 745 A.2d 1000, 1020–21 (2000).

The contract was signed by a representative of each of the Property Owners and by Mayor James Grimes for the City of Frederick, and was to be "binding upon, and inure[ ] to the benefit of, the parties hereto and their respective heirs, personal representatives, agents, employees, invitees, successors and assigns," and its enumerated obligations were to "run with the land ... and ... be binding upon all future owners."

In May of 2001, Riverside Investment Group assigned all of its rights in the contract to purchase the South Campus from J And R Limited Partnership to Riverside South, LLC, and J And R Limited Partnership subsequently sold and conveyed the deed to the property to Riverside South, LLC.

On October 3, 2002, the City of Frederick passed Ordinance G–02–19, § 1, which titled Chapter 11 of the City Code, a reserved chapter, "Fees," and levied impact fees for the first time in the City for the purpose of requiring:

> that new residential, commercial, institutional and industrial development pay for its appropriate share of capital improvements to the city's water and sewer treatment and distribution systems through the imposition of water and sewer impact fees which will be used to finance, defray and reimburse the city for all or a portion of the costs of capital improvements to the city's water and sewer treatment and distribution systems.

City of Frederick Code, Chapter 11, Section 11–1(b). The ordinance cited for authority Article XI–E of the Maryland Constitution, Article 23A of the Annotated Code of Maryland, and the City of Frederick Charter. Section 11–1 of the new chapter, entitled "Water and sewer impact fees," provided in pertinent part:

> (d) Applicability. Any person who, after the effective date of this section, undertakes residential, commercial, institutional or industrial development shall pay a water and sewer impact fee prior to receiving a permit from the department of permits and inspections. The impact fee also applies to any existing residential, commercial, institutional or industrial structure which is not presently connected to a city

water and sewer system, when a new system is constructed or the extension of an existing system has been declared ready for service, and the property owner is required to connect to the new system.

City of Frederick Code, Chapter 11, Section 11–1(d). Another fee imposed by the new chapter was the "Park Facilities development impact fee" included in Section 2, which states in relevant part:

d. Applicability. Any person who undertakes a residential development project shall pay a park facilities development impact fee and shall not receive a building permit until such park facilities development impact fee is paid.

City of Frederick Code, Chapter 11, Section 11–2(d).

In June of 2004, then Mayor Jennifer Dougherty[4] and the Property Owners entered into a second agreement entitled "Agreement To Defer Public Improvements" ("the Deferral Agreement"). The new Agreement granted the Property Owners an exception to Sections 2(g), 5.02, and 5.03 of the Subdivision Regulations of the City of Frederick, which required installation and acceptance of necessary public improvements prior to the final approval of subdivision plats.[5] The Agreement also iterated that:

---

**4.** Two of the "Whereas" clauses in the Agreement refer to the receipt by the mayor and board of aldermen of sufficient surety to cover construction costs, but the record is devoid of any evidence of any legislative authority for the Agreement.

**5.** The Deferral Agreement specifically provided that:

**WHEREAS,** The City of Frederick has agreed to enter into this Deferral Agreement to allow (a) plat recordation for the North Campus and South Campus of the Project, (b) full development of all lots on the North Campus and South Campus, including but not limited to the issuance of building permits for any and all such lots, and (c) *deferral of public improvements* along Gas House Pike in front of and/or benefiting Lot 301, Lot 302, Out Lot "G" and Out Lot "H" on the South Campus of the Project, with the understanding that the Parties hereby state their intent to negotiate toward reaching future agreement (hereinafter referred to as the "Future Agreements") regarding both the funding mechanism and the relative construction obligations of the Parties with regard to all public improvements along Gas House Pike.

The City of Frederick and the Riverside Owners hereby agree that the present and/or future owners/developers of the Site Plan Lots shall, upon issuance of any permit issued by The City of Frederick with reference to any of the Site Plan Lots, pay unto the City of Frederick the Fee, based upon One Dollar ($1.00) per square foot of gross floor area of any proposed building to be constructed on any of the Site Plan Lots.... In no event shall any of the Lot Purchasers and/or owners/developers of the Site Plan Lots be required to pay any fees or assessments or otherwise be held responsible for payment of any fees or assessments related to offsite improvements beyond the $1.00 per square foot to be paid at time of building permit issuance.

On June 25, 2004, Riverside South LLC sold its property rights in the South Campus of the Riverside Corporate Park Project to Riverside Apartments ("Riverside"), a limited liability company consisting of two member companies, River Walk Apartments, LLC, and Monocacy River Apartments, LLC.

In October of 2004, and again in March of 2005, Riverside Apartments submitted applications for shell construction permits to construct 144 units, a club house, two garage buildings, and twelve buildings on plat 301 of the South Campus of the Riverside Corporate Park Project, along with a payment of the $1.00 per square foot for each proposed structure, as required by both the November and the Deferral Agreement. The City denied the applications, stating that "in addition to the $1.00 per square foot fee, all impact fees must be paid prior to the issuance of any of the aforementioned building permits," to include the payment of water, sewer, and park fees.

Riverside responded by filing a complaint for a writ of mandamus and specific performance in the Circuit Court for Frederick County, requesting that the City of Frederick be directed to issue the shell construction permits for the $1.00 per square foot assessment fee provided in both the Novem-

(emphasis added).

ber and the Deferral Agreements, and also filed a motion for summary judgment requesting judgment for Riverside on the grounds that there were no disputed facts, that the municipality was bound by its contracts, and that the City of Frederick had entered into a valid and enforceable written agreement and therefore was bound to honor the $1.00 per square foot special assessment fee. The City responded to the motion for summary judgment, stating that there were material issues of fact, specifically, whether Riverside had standing to enforce the Agreements because Riverside was not a signatory to either Agreement. The City also argued that Riverside was not entitled to judgment as a matter of law because the Agreements only exempted the property from regulatory fees, not water, sewer and park facility impact fees, and that, even if the Agreements did exempt River Walk from paying those fees, because they constitute taxes, they can only be waived by the Maryland General Assembly and therefore, without such authorization, the waiver was *ultra vires* and not enforceable.

After hearing oral argument on the motion for summary judgment, the trial judge ruled in Riverside's favor, stating:

[The November and the Deferral] agreements are clear and unambiguous. In each agreement, the City, in exchange for the rights-of-way granted to it by Riverside, pledges to charge the Plaintiff no more than the $1.00 per square foot special assessment for building permits. The City, however, has refused to issue any permits despite the fact that Riverside has complied with the terms of the contracts and paid the required special assessment fee for each permit it has applied for. The City, instead, attempts to charge Riverside for additional environmental impact fees beyond the agreed upon assessment.

This position is not consistent with the agreements entered into by the City in November of 2000 and June of 2004. While the City has willingly accepted the benefits of their agreements—the rights-of-way granted to it by Riverside—it has not fulfilled its obligations under the same contracts. The City entered into a valid and enforceable contract with the Plaintiff and must like any other individual

or entity, live up to the terms of its agreements. Accordingly, because there are no material facts in dispute, it is appropriate to enter summary judgment on behalf of the Plaintiff.

The judge also ordered that the City "not require [Riverside] to pay any additional fees, beyond the one dollar per square foot agreed upon" in the November and the Deferral Agreements in order to acquire the shell construction permits.

The City noted a timely appeal to the Court of Special Appeals, wherein it argued that both the November Agreement and the Deferral Agreement's special assessment fee and waiver of future impact fees were void. The City maintained that, under Section 2 of Article 23A of the Maryland Code (1957, 2001 Repl.Vol.), the legislative body of the municipality must enact ordinances in order to establish impact fees, and that the two Agreements were not legislatively authorized, but instead constituted private agreements between Riverside and the two mayors.[6]

In the Court of Special Appeals, River Walk argued that the contracts actually constituted the purchase of certain rights of way, and that the Mayors possessed the authority under Section 2(b)(24) of Article 23A, Maryland Code (1957, 2001 Repl.Vol.),[7] and Section 35B of Article 5 of the City of Freder-

---

**6.** Shortly after the appeal was filed, Riverside Apartments, LLC, dissolved and divided its rights in the South Campus into two parts, conveying one part to its member company, River Walk Apartments, LLC, and the other part to the other member company, Monocacy River Apartments, LLC. River Walk and Monocacy River ("River Walk") then moved as the successors-in-interests to Riverside's property rights to be substituted for Riverside as appellees in the Court of Special Appeals, a motion which the intermediate appellate court granted.

**7.** Section 2(b)(24) of Article 23A, Maryland Code (1957, 2001 Repl.Vol.) provides in relevant part:

(b) *Express powers.*—In addition to, but not in substitution of, the powers which have been, or may hereafter be, granted to it, such

ick Charter, to enter into contracts on behalf of the City to procure necessary rights-of-way to complete the Monocacy Boulevard Extension. River Walk also asserted that because municipalities are bound by their contractual obligations, the November and the Deferral Agreements should be enforced.

The Court of Special Appeals disagreed and reversed the grant of summary judgment to River Walk, holding that Section 2 of Article 23A and Section 7 of Article II of the City of Frederick Charter mandate that all fees imposed by the City and any waiver thereof must be authorized by ordinance, and because no ordinance authorizing either the November or the Deferral Agreement was enacted, both contracts were *ultra vires* and therefore *void ab initio.*

Before this Court, River Walk contends that, pursuant to Sections 142, 143 and 147 of Article XI,[8] and Sections 168, 172,

---

legislative body also shall have the following express ordinance-making powers:

\* \* \*

(24) To acquire by conveyance, purchase or condemnation real or leasehold property needed for any public purpose; to erect buildings thereon for the benefit of the municipality; and to sell at public or private sale after twenty days' public notice and to convey to the purchaser or purchasers thereof any real or leasehold property belonging to the municipality when such legislative body determines that the same is no longer needed for any public use.

Maryland Code (1957, 2001 Repl.Vol.), Article 23A Section 2(b)(24).

8. Section 142 of Article XI of the City of Frederick Charter provides:

**General control of city over public ways.**

The City of Frederick shall have charge of all the public ways in the city except such as may be under the jurisdiction of the Maryland State Roads Commission. Subject to the laws of the State of Maryland and to this Charter, the City of Frederick may do whatever it deems necessary to establish, operate, and maintain in good condition the public ways of the city.

City of Frederick Charter, Article XI, Section 142.

Section 143 provides:

**Powers of city in connection with public ways.**

The City of Frederick shall have the power:

(a) To establish and change from time to time the grade lines, width, and construction materials of any city public way or part thereof.

(b) To grade, lay out, open, extend, and make new city public ways.

(c) To grade, straighten, widen, alter, improve, or close up any existing city public way or part thereof.

and 174 of Article XIV [9] of the City of Frederick Charter, the

(d) To pave, surface, repave, or resurface any city public way or part thereof.

(e) To construct, maintain, and repair bridges.

(f) To name city public ways and to number houses and lots.

(g) To assess the cost, in whole or in part, of any projects under (b), (c) and (d) of this section on the abutting property in the manner provided in section 168 of this Charter.

City of Frederick Charter, Article XI, Section 142.

Section 147 provides:

**Power of city to purchase or condemn property for projects under this article.**

For the purpose of carrying out any of the work or projects provided for in this article, the city shall have the power to purchase or condemn any property it deems necessary as hereinafter provided. Any of the projects shall be considered as public improvements within the meaning of section 174 of this Charter. Any condemnation proceedings shall be carried on in accordance with section 174 of this Charter.

City of Frederick Charter, Article XI, Section 147.

9. Section 168 of Article XIV provides:

**Power and authority generally in connection with public property.**

The City of Frederick shall have the power to acquire, hold, and dispose of property, real, personal, or mixed, within or without the boundaries of the city for any public or municipal purpose by purchase, gift, bequest, devise, lease, condemnation, or otherwise. The City of Frederick may receive in trust and control for any general corporate purpose of such trust all money and other property which may have been or shall be bestowed upon it by will, deed, or any other form of gift or conveyance in trust for any general corporate purpose, or in aid of the indigent poor, or for the general purpose of education, or for charitable purposes of any description within the city. All city property, franchises, and funds of every kind now belonging to or in the possession of the mayor and aldermen of Frederick are hereby vested in the City of Frederick.

City of Frederick Charter, Article XIV, Section 168.

Section 172 of Article XIV provides:

**Acquisition and disposal.**

The City of Frederick may acquire, by gift, purchase or otherwise, any real or personal property and any interest, franchise, easement or privilege therein, including (without limitation) stock of a corporation, land and buildings or other improvements, in its discretion as it deems necessary for any public or municipal purpose, and may sell, lease, mortgage, or otherwise dispose of any property belonging to the city in its discretions [discretion] it deems necessary for any public or municipal purpose, to any private, public or other corporation, partnership, association, person or other entity, and may take any and all actions and enter into any and all agreements in its discretion as it deems necessary or desirable in order to accomplish

Mayor possesses the *executive* power to purchase or condemn property such as the rights-of-way at issue in this case. Therefore River Walk maintains that, as an *executive* act, no ordinance or legislative act was required in order for the City to enter into the Agreements. Further, River Walk maintains that the Mayor, as the chief executive officer of the City, has the inherent, executive power to purchase property on the City's behalf and the November and the Deferral Agreements, therefore, constituted an exercise of that executive power. River Walk also argues that municipalities are bound by their contractual obligations.

Conversely, the City of Frederick asserts that the November and the Deferral Agreements constituted a waiver of all impact and assessment fees and the creation of a new special assessment fee, which, the City maintains, the Mayor has no authority to do. The City argues that, before any fee can be

---

such purposes. The city may assume any mortgage, lease or other obligation in connection with any such acquisition and may finance any such acquisition by the issuance of bonds pursuant to Section 114 and Section 115 of this Charter, which bonds may be sold or issued in exchange for cash, the property being acquired, or the stock of the corporation owning or having an interest in such property or for such other consideration as may be determined by the ordinance or resolution of the board of aldermen authorizing such bonds. Any obligation represented by any mortgage, installment sales, conditional sales, lease purchase or other financing agreement for the acquisition of such property shall constitute a borrowing and bonds within the meaning of Section 114 and Section 115 of this Charter if so provided by ordinance or resolution of the board of aldermen. In the event that any bonds are issued in exchange for any consideration other than cash, the value of such consideration shall be determined on such basis as the board of aldermen determine in their discretion and such determination of value shall be conclusive for the purposes of this section and Sections 114 and 115 of this Charter, including for the purpose of calculating the limitation provided in Section 115 of this Charter on the amount of bonds which may be issued by the city.
City of Frederick Charter, Article XIV, Section 172.
　　Section 174　of Article XIV provides:
**Authority of city to protect city property.**
The City of Frederick shall have the power to take all measures it deems necessary to protect the buildings and all other property of the city.
City of Frederick Charter, Article XIV, Section 174.

imposed by the municipality, it must be legislatively authorized. Further, the City contends that, the waiver of fees is a corollary to the imposition of fees, so it too would require legislative authorization.[10]

## II. Analysis

■■■■■ In this case we are called upon to determine whether the trial judge properly granted summary judgment on behalf of River Walk. The entry of summary judgment is governed by Maryland Rule 2–501, which provides in pertinent part that:

(f) **Entry of judgment.** The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.

Maryland Rule 2–501(f). The question of whether the trial court properly granted summary judgment is a question of law and is subject to *de novo* review on appeal. *Standard Fire Ins. Co. v. Berrett*, 395 Md. 439, 450, 910 A.2d 1072, 1079 (2006); *Miller v. Bay City Prop. Owners Ass'n, Inc.*, 393 Md. 620, 632, 903 A.2d 938, 945 (2006), quoting *Myers v. Kayhoe*, 391 Md. 188, 203, 892 A.2d 520, 529 (2006); *Ross v. State Bd. of Elections*, 387 Md. 649, 658, 876 A.2d 692, 697 (2005); *Todd v. MTA*, 373 Md. 149, 154, 816 A.2d 930, 933 (2003); *Beyer v. Morgan State Univ.*, 369 Md. 335, 359, 800 A.2d 707, 721 (2002). If no material facts are in dispute, we must determine whether summary judgment was correctly entered as a matter of law. *Standard Fire Ins. Co.*, 395 Md. at 450, 910 A.2d at 1079; *Ross*, 387 Md. at 659, 876 A.2d at 698; *Todd*, 373 Md. at 155, 816 A.2d at 933; *Beyer*, 369 Md. at 360, 800 A.2d at 721. On appeal from an order entering summary judgment, we

---

**10.** The City also contends that the Agreements violated Annexation Resolution Number 6–85, and illegally contracted away the City's power to legislate to protect the health, safety and welfare of its residents. Because we shall hold that the Mayors did not have the authority to enter into agreements waiving the City's impact fees and creating "special assessment" fees, we do not reach these arguments.

review "only the grounds upon which the trial court relied in granting summary judgment." *Standard Fire*, 395 Md. at 450, 910 A.2d at 1079; *Ross*, 387 Md. at 659, 876 A.2d at 698, quoting *Eid v. Duke*, 373 Md. 2, 10, 816 A.2d 844, 849 (2003), quoting in turn *Lovelace v. Anderson*, 366 Md. 690, 695, 785 A.2d 726, 729 (2001).

In the case before us, River Walks seeks the enforcement of both the November and the Deferral Agreements, entered into by different Mayors. Both Agreements obliged the Property Owners' successors to convey certain rights-of-way to the City in exchange for the creation of a "special assessment" fee provision, which allowed River Walk to obtain all necessary shell construction permits from the City for a fee of $1.00 per square foot of each shell to be constructed, instead of any impact fees. River Walk asserts that the November and the Deferral Agreements constituted the purchase of necessary rights-of-way necessary for the completion of an existing public ways project, specifically, Phase III of the Monocacy Boulevard Project. River Walk contends that, because these Agreements represented nothing more than the implementation of an already authorized and existing public project, they constituted *executive*, not *legislative*, actions, which the Mayor, as the chief executive officer of the City, possessed the requisite authority to do on behalf of the City and cites *Eggert v. Montgomery County Council*, 263 Md. 243, 259, 282 A.2d 474, 482 (1971) (stating that an executive action is one "which merely looks to or facilitates the administration, execution or implementation of a law already in force and effect") (emphasis added), quoting *Scull v. Montgomery Citizens League*, 249 Md. 271, 282, 239 A.2d 92, 98 (1968), and *Queen Anne's Conservation, Inc. v. County Commissioners of Queen Anne's County*, 382 Md. 306, 321, 855 A.2d 325, 334 (2004) (stating that the negotiation of contracts on behalf of a local government body constitutes a discretionary, executive action), for authority. Therefore, River Walks posits, the Agreements should be enforced.

■ Contrary to River Walk's assertions, the gravamen of this case is not whether the Mayor had the power to purchase

land, establish necessary rights-of-way, or even enter into contracts on behalf of the City. The gravamen of this case is whether the two Mayors had the requisite authority to create special assessment fees on behalf of the City and to waive impact fees.

■ The City of Frederick is a municipality, incorporated in 1816 pursuant to Chapter 74 of the Acts of 1816. Municipalities possess only such powers as have been conferred upon them by the Legislature. *Jewel Tea Co. v. Town of Bel Air*, 172 Md. 536, 539, 192 A. 417, 418 (1937). This Court explicated as early as 1872 in *Mayor and Council of Hagerstown v. Sehner*, 37 Md. 180 (1872), that municipalities are:

> public corporations created by the Legislature for political purposes, with political powers, to be exercised for purposes connected with the public good, in the administration of civil government. They are instruments of government *subject at all times to the control of the Legislature* with respect to their duration, powers, rights and property. It is of the essence of such a corporation, that the government has the sole right as trustee of the public interest, at its own good will and pleasure, *to inspect, regulate, control and direct the corporation, its funds and franchises.* These are the unquestioned general doctrines on this subject, sustained by all the authorities.

*Id.* at 193 (emphasis added).

■ Possessing no inherent powers, municipalities, therefore, are limited to exercising only those expressly granted by the Legislature, those "necessarily or fairly implied in or incident to the powers expressly granted," and those powers essential or indispensable to "the accomplishment of the declared objects and purposes of the corporation." *Hardy v. Housing Mgmt. Co.*, 293 Md. 394, 396–97, 444 A.2d 457, 458 (1982); *Barlow v. Friendship Heights Citizens' Comm.*, 276 Md. 89, 93, 344 A.2d 415, 417 (1975); *City of New Carrollton v. Belsinger Signs, Inc.*, 266 Md. 229, 237, 292 A.2d 648 (1972); *McRobie v. Mayor and Comr's of Westernport*, 260 Md. 464, 466, 272 A.2d 655, 656 (1971).

■ The municipal power implicated in this case is the power to impose and waive impact fees. Article 14 of the Maryland Declaration of Rights states that "no aid, charge, tax, burthen or fees ought to be rated or levied, under any pretense, without the consent of the Legislature." Maryland Declaration of Rights, Article 14. Section 5 of Article XI–E of the Maryland Constitution grants the General Assembly the power to authorize municipalities to levy taxes and fees:

No such municipal corporation shall levy any type of tax, license fee, franchise tax or fee which was not in effect in such municipal corporation on January 1, 1954, *unless it shall receive the express authorization of the General Assembly for such purpose, by a general law* which in its terms and its effect applies alike to all municipal corporations in one or more of the classes provided for in Section 2 of this Article.

Maryland Constitution, Section 5 of Article XI–E (emphasis added). Thus, "a municipality may levy only such type of tax, license fee, franchise tax or fee that is *specifically authorized* by the General Assembly." *Tidewater/Havre de Grace, Inc. v. Mayor and City Council of Havre de Grace,* 337 Md. 338, 343, 653 A.2d 468, 471 (1995) (emphasis added). *See also Campbell v. Mayor & Aldermen of City of Annapolis,* 289 Md. 300, 305, 424 A.2d 738, 741 (1981).

The General Assembly, pursuant to Article 23A of the Maryland Code (1957, 2001 Repl.Vol.),[11] delegated to the legislative bodies of municipalities the general authority to establish and collect reasonable fees and charges; the relevant portions of Section 2 of Article 23A are:

(a) *General authority.*—The *legislative body* of every incorporated municipality in this State, except Baltimore City, by whatever name known, shall have general power to pass such ordinances *not contrary to the Constitution of Maryland,* public general law, or, except as provided in § 2B of this article, public local law as they may deem necessary in

---

11. All references hereinafter to Article 23A are to Maryland Code (1957, 2001 Repl.Vol.).

order to assure the good government of the municipality, to protect and preserve the municipality's rights, property, and privileges, to preserve peace and good order, to secure persons and property from danger and destruction, and to protect the health, comfort and convenience of the citizens of the municipality. . . .

(b) *Express powers.*—In addition to, but not in substitution of, the powers which have been, or may hereafter be, granted to it, *such legislative body* also shall have the following express ordinance-making powers:

\* \* \*

(5) To make reasonable regulations concerning buildings and signs to be erected within the limits of the municipality, including a building code and the requirement for building permits.

\* \* \*

(33) Subject to the limitations imposed under Article 24 of the Code, the Tax—General Article, and the Tax—Property Article, *to establish and collect reasonable fees and charges;*

(i) For the franchises, licenses, or permits authorized by law to be granted by a municipal corporation; or

(ii) Associated with the exercise of any governmental or proprietary function authorized by law to be exercised by a municipal corporation.

Article 23A Section 2 (emphasis added).

We recently held in *J.P. Delphey Ltd. P'ship v. Mayor and City of Frederick,* 396 Md. 180, 913 A.2d 28 (2006) ("Delphey"), that the express powers enumerated in Section 2 of Article 23A of the Maryland Code were conferred upon the *legislative body* of the municipalities, which in the City of Frederick is the Aldermen, pursuant to Section 7 of Article II of the City of Frederick Charter. In *Delphey,* a private company challenged the condemnation of its property by the City of Frederick on the ground that the City had failed to enact an ordinance specific to the property authorizing the condemnation. We concluded in *Delphey* that:

The plain language of Section 2(b) confers the power of condemnation on the *legislative body* of the municipality. Section 7 of Article 2 of the City of Frederick Charter vests "[a]ll legislative powers of the city" in the Aldermen, and Section 173 of Article Fourteen of the Charter also authorizes the Aldermen to:

> condemn any property, right, or interest belonging to any person, persons, corporation, or corporations for the purpose of making any public improvement.

Thus, pursuant to the express grant of authority of Section 2(b)(24) of Article 23A and Section 173 of the City of Frederick Charter, the Aldermen, acting in their legislative capacity, possessed the requisite authority to condemn the Delphey property specifically when they so voted in the November 6 closed, executive session.

*Id.* at 35. Thus, the delegation of the express powers enumerated in Section 2(b) of Article 23A is to the Aldermen of the City of Frederick.

We held in *Eastern Diversified Properties, Inc. v. Montgomery County*, 319 Md. 45, 570 A.2d 850 (1990) ("Eastern Diversified"), that impact fees constitute taxes. In *Eastern Diversified,* a developer contested Montgomery County's imposition of impact fees as a prerequisite for obtaining building permits. We noted that a distinction exists between the imposition of fees and the imposition of taxes, and that, in making that distinction, " 'the purpose of the enactment governs rather than the legislative label.' " *Id.* at 53, 570 A.2d at 854. We explicated that a fee is typically "part of a regulatory measure," whereas a tax is "an 'enforced contribution to provide for the support of [the] government.' " *Id.* at 52, 54, 570 A.2d at 854, quoting *United States v. LaFranca,* 282 U.S. 568, 572, 51 S.Ct. 278, 280, 75 L.Ed. 551, 555 (1931). Noting that the stated purpose for the impact fees established by Montgomery County was to ensure that "new development in certain impact fee areas ... pay their pro rata share of the costs of impact highway improvements necessitated by such new development," we determined that "the characteristics of the development impact fee scheme as set forth [in the

Montgomery County Code] are indicative of a tax rather than a regulatory fee." *Id.* at 54, 570 A.2d at 854, 855.

In the case *sub judice,* pursuant to the delegation of legislative power to municipalities enumerated in Article XI–E of the Maryland Constitution and Article 23A of the Maryland Code, Section 166–A of Article XIII of The City of Frederick Charter provides:

> **Powers of city generally.**
>
> The City of Frederick shall have the power to levy and collect taxes in the form of special assessments upon property in a limited and determinable area for special benefits conferred upon such property by the construction or installation of water mains, sewer mains, public ways, sidewalks, curbs, gutters, and storm water sewers, and to provide for the payment of all or any part of the above projects out of the proceeds of such special assessment.

City of Frederick Charter, Article XIII, Section 166–A. Exercising the power enumerated in Section 166–A, the Aldermen of the City of Frederick passed Ordinance G–02–19, § 1, which imposes impact fees in the City of Frederick for the stated purpose of "requir[ing] that new residential, commercial, institutional and industrial development pay for its appropriate share of capital improvements to the City's water and sewer treatment and distribution systems." Under our cases, these fees, imposed to raise revenue for the City, may be created only by legislative act and therefore, by implication, may be waived only by legislative act. Thus, neither Mayor Grimes nor Mayor Dougherty possessed the requisite authority to levy the "special fee" created in the November and the Deferral Agreements, or to waive the impact fees created by Ordinance G–02–19, § 1.

River Walk maintains, however, that even if only the legislative body has the power to impose fees and also waive fees, that the City of Frederick is bound by the contract, citing *Montgomery County v. Revere National Corp.,* 341 Md. 366, 671 A.2d 1 (1996), *City of Greenbelt v. Bresler,* 248 Md. 210, 236 A.2d 1 (1967), *Cohen v. Baltimore County,* 229 Md.

519, 185 A.2d 185 (1962), and *Board of County Commissioners of Harford County v. MacPhail,* 214 Md. 192, 133 A.2d 96 (1957), for support. We disagree; none of these cases implicate actions that were ultra vires on the part of the municipality or the agent acting on the municipality's behalf.

A municipality is not bound by those actions which transcend its authority and the authority of those allegedly acting on its behalf; those actions are *ultra vires.* As early as 1869, this Court clarified in *Horn v. City of Baltimore,* 30 Md. 218 (1869), that actions taken by the Mayor transcending his or her authority are *ultra vires* and therefore, not binding on the municipality. We explicated in *Horn* that:

> These persons thus selected [to be Mayor] become the agents and representatives of the [municipality]. As such they are entrusted with certain powers, which are specially defined and limited, and which can be exercised by them in the manner and form only prescribed by law. To the extent alone of these powers, can they bind their principal, and so long as they keep within them, the corporation is responsible for their acts. But whenever they transcend them, their acts, although done *colore officii,* and upon pretense of law, are no more binding upon the [municipality] than the acts of an agent in any other case can bind his principal, when done beyond the scope of the authority conferred.

*Id.* at 222. We therefore held that acts undertaken by an agent of a municipality, including the Mayor, if not properly authorized, are *"ultra vires "* and therefore invalid. *Id.* at 224.

We iterated again in *Inlet Associates v. Assateague House Condominium Ass'n,* 313 Md. 413, 545 A.2d 1296 (1988) ("Inlet"), that contracts entered into by municipalities without proper authorization are *ultra vires* and unenforceable. We held in *Inlet* that a resolution passed by the Ocean City Council by which the City was to convey twenty-five feet of a city street and its appurtenant riparian rights to Inlet, a private corporation, in exchange for Inlet's agreement to develop and maintain the property, was *ultra vires* because it did not comply with the requirements of Article 23A and the

Ocean City Charter for an ordinance, conveying City property. *Id.* at 433–34, 545 A.2d at 1306. We emphasized in *Inlet* that the "conveyance of the City's interest in the [property] solely for the private benefit of another, is not within the legislative body's power," and went on to state that both the Ocean City Charter and Section 2(b)(24) of Article 23A required that the Ocean City Council affirmatively make a determination that "there is no longer any public need for the street" before undertaking the conveyance, and that the Council's actions failed to comply with this requirement. *Id.* at 431, 545 A.2d at 1305. The Court also stated that a legislative act conveying property was required to be signed by the Mayor or passed over the Mayor's veto, and that the City Council's actions failed to meet this requirement. *Id.* at 433–34, 545 A.2d at 1306. The *Inlet* opinion concluded that:

> Considering the central involvement of South Division Street and the waters of the bay in Inlet's proposal, and the magnitude of the property interests involved (City property of estimated value approximating one million dollars), a simple resolution, *neither reduced to writing nor journalized as required by the City Charter,* cannot suffice to validate the City's actions. An ordinance was thus fundamental to the legality of the conveyances here in question; without it, the City Council's action was without legal effect.

*Id.* (emphasis added).

In the case before us, neither the Mayor who signed the November Agreement, nor the Mayor who signed the Deferral Agreement, possessed the requisite authority to create a special fee or to waive impact fees; these actions required legislative authorization, which was never obtained, so we hold that both are *ultra vires* and unenforceable.[12]

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED WITH COSTS.**

---

12. The City of Frederick conceded at oral argument that it would refund the $1.00 per square foot special assessment fee which River Walk submitted with its application for shell construction permits.

**550**

Consistent with their positions in *Delphey,* 396 Md. 180, 913 A.2d 28 (2006), Judges CATHELL and HARRELL join in the judgment only.