*K. Hovnanian Homes of Maryland, LLC, et al. v. Mayor and City Council of Havre de Grace, et al.*, No. 22, September Term, 2020, Opinion by Booth, J.

**MUNICIPAL CONTRACTS – ESTABLISHMENT OF FEES – MUNICIPAL HOME RULE AMENDMENT – ACTIONS INCONSISTENT WITH DELEGATION OF EXPRESS POWERS UNENFORCEABLE –** K. Hovnanian Homes of Maryland, LLC sought to enforce an agreement against the Mayor and City Council of Havre de Grace, which was approved by the City Council by a verbal motion at a public meeting, but was not executed by the Mayor. The Court held that the agreement is not a valid and enforceable contract against the City. Stripped of its labels, the governmental action that is the subject of the agreement is the imposition and collection of a fee on municipal property owners. Under the Municipal Home Rule Amendment of the Maryland Constitution, Article XI-E, as well as the express powers delegated to municipalities by the General Assembly, and the applicable provisions of the Havre de Grace Charter, the imposition of a fee by the City must be undertaken by the municipal legislative body known as the "Mayor and City Council of Havre de Grace" and pursuant to a duly enacted ordinance. Because no such ordinance was enacted, the agreement is *ultra vires* and unenforceable.

IN THE COURT OF APPEALS

OF MARYLAND

No. 22

September Term, 2020

K. HOVNANIAN HOMES OF
MARYLAND, LLC, et al.

v.

MAYOR AND CITY COUNCIL OF
HAVRE DE GRACE, et al.

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

Opinion by Booth, J.

Filed: January 29, 2021

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

In this case, we are asked to determine whether a developer, K. Hovnanian Homes of Maryland, LLC ("Hovnanian"), can enforce an agreement against the Mayor and City Council of Havre de Grace ("Mayor and City Council"), which was approved by the City Council by a verbal motion at a public meeting. The agreement, which is titled "Infrastructure Capital Projects Cost Recoupment Agreement" (sometimes referred to as "Recoupment Agreement" or "Agreement"), provides that the City will impose and collect a "recoupment fee" for each residential dwelling unit constructed on two parcels of property described as "Parcel 2" and "Parcel 3" in connection with the development of 414 residential dwelling units on those properties. Hovnanian constructed residential units on the adjacent parcel known as "Parcel 1," as well as water, sewer, and other infrastructure that serve the Parcel 1 development, which Hovnanian contends will also benefit residences constructed on Parcels 2 and 3. Under the terms of the Recoupment Agreement, the City will collect a fee in the amount of $3,304.57 per residential dwelling unit, to be paid by the property owners upon the issuance of each building permit, and remit the fee to Hovnanian, representing the property owners' pro rata share of Hovnanian's infrastructure costs. The potential aggregate amount of fees that will be collected and remitted to Hovnanian under the Agreement is $1,368,094.47. The City's collection obligations are for 21 years.

After the City Council approved the Recoupment Agreement by verbal motion and authorized the Mayor to sign the Agreement, the owners of Parcels 2 and 3 objected to the Agreement. Hovnanian and the property owners were not able to agree on a reimbursement amount, and the Mayor refused to sign the Recoupment Agreement. In the meantime, development activities commenced on Parcel 3, resulting in the issuance of 33 building

permits. The City did not collect any recoupment fees sought by Hovnanian under the Recoupment Agreement.

Hovnanian filed a complaint against the Mayor and City Council of Havre de Grace in the Circuit Court for Harford County.[1] In its complaint, Hovnanian sought: (1) a declaration that the Agreement is a "valid, binding and enforceable contract[;]" (2) the issuance of a writ of mandamus directing the current Mayor to sign the Agreement and record it in the land records; and (3) damages in the amount of $109,050.81, representing the fees that the City failed to collect on the first 33 building permits, plus per diem interest at the statutory rate of 6%.

The case was decided on cross-motions for summary judgment, with the parties focusing their legal arguments on the applicable provisions of the Havre de Grace Charter ("Charter"). After the first summary judgment hearing, the circuit court determined that under the Charter, the Agreement was not valid and enforceable and entered judgment in favor of the Mayor and City Council. Hovnanian appealed. The Court of Special Appeals reversed the circuit court's judgment and remanded for further proceedings. Once again, the parties filed cross-motions for summary judgment. This time, the circuit court declared that under the applicable provisions of the Charter, the Agreement was, in fact, a binding and enforceable contract. The circuit court issued a writ of mandamus directing the Mayor

---

[1] The lawsuit was filed by K. Hovnanian Homes of Maryland, LLC ("Hovnanian") and its affiliated entity, Greenway Investments, LLC against the Mayor and City Council of Havre de Grace, and William T. Martin, Mayor, in his official capacity. For simplicity's sake, we shall collectively refer to the plaintiffs (now Petitioners) as "Hovnanian" and the defendants (now Respondents) as the "Mayor and City Council" or the "City."

to record the Agreement and entered judgment against the Mayor and City Council and in Hovnanian's favor, in the amount of $144,822.32. The City appealed to the Court of Special Appeals. In a reported opinion, the Court of Special Appeals reversed the judgment of the circuit court. *Mayor and City Council of Havre de Grace v. K. Hovnanian Homes of Maryland, LLC*, 246 Md. App. 144, 159 (2020). The Court of Special Appeals considered the Recoupment Agreement, and the City's authority to execute it, within the context of the Charter. *Id.* at 149–56. Based upon its reading of the Charter, the intermediate appellate court concluded that the structure of the Havre de Grace government constituted "a strong mayor system[.]" *Id.* at 150. The Court of Special Appeals reasoned that "[e]ntering into contracts is an executive branch function." *Id*. at 154. Accordingly, the intermediate appellate court held that the Mayor, as the executive branch official, or his subordinate, must enter into the Recoupment Agreement. *Id.* at 158–59. Because the Mayor did not execute the Agreement, the Court of Special Appeals held that the City could not be bound. *Id.* at 159.

Hovnanian petitioned for writ of *certiorari*, and we granted its petition to answer the following question, which we have rephrased:[2]

---

[2] The questions presented in the petition for writ of certiorari were:

1. Did the Court of Special Appeals err by holding that a "strong mayor" city charter abrogates the common law of municipal contracts, which gives a city council power to enter into contracts by motion or resolution without the mayor's signature?

2. Did the Court of Special Appeals err by holding that under the separation of powers doctrine, a "strong mayor" city charter invalidates a recoupment agreement entered into by a city council without the mayor's signature?

3

Did the City Council's verbal motion at a public meeting to approve the Recoupment Agreement create a binding and enforceable agreement?

For the reasons set forth below, we answer the question in the negative. We affirm the judgment of the Court of Special Appeals, but for entirely different reasons.

As set forth more fully herein, the applicable provisions of the Charter must be read within the context of Maryland Constitution, Article XI-E, Section 5 and the General Assembly's delegation of express ordinance-making powers as set forth in Title 5, Subtitle 2 of the Local Government Article. Under the Maryland Constitution, the express powers delegated by the General Assembly, and the applicable provisions of the Charter, the imposition of a fee by the City must be undertaken by the municipal legislative body known as the "Mayor and City Council of Havre de Grace" and pursuant to a duly enacted ordinance. Because no such ordinance was enacted, the Recoupment Agreement is *ultra vires* and unenforceable.

## I

### Factual Background

#### A. *Annexation and Development of Parcel 1/Phase 1*

In 2004, the Mayor and City Council of Havre de Grace adopted Annexation Resolution 244, which annexed approximately 150 acres of undeveloped property to the City. Greenway Investments, LLC (sometimes referred to as "Greenway Investments") owned 133 acres of the property that was the subject of the annexation (the "Greenway Property" or "Property"). The Annexation Resolution contemplated that up to 690 residential dwelling units would be constructed on the Greenway Property. The

4

Annexation Resolution set forth the general terms and conditions for constructing public improvements that would be required to serve the new development. Specifically, the owners of the Greenway Property would be responsible for all on-site public improvements to serve the Property, including water and sewer lines and public roads. After the improvements were constructed at the owner's expense, the Resolution contemplated that the water and sewer facilities and roads would be dedicated and accepted by the City, thereby becoming part of the public infrastructure.

Following annexation, Greenway Investments and Hovnanian worked with the City on a development plan for the Greenway Property consistent with the terms of the Annexation Resolution. In October 2005, the Greenway Property was subdivided into three separate parcels, identified as Parcels 1, 2, and 3. At the time of subdivision, a site plan was approved by the City's director of public works, which reflected the intended development of the three separate parcels in three corresponding phases. Specifically, the site plan contemplated that Parcel 1 would be developed as "Phase 1" (consisting of 276 residential units), Parcel 2 would be developed as "Phase 2" (consisting of 166 residential units), and Parcel 3 would be developed as "Phase 3" (consisting of 248 residential units).

In December 2005, the Mayor and City Council, Greenway Investments, and Hovnanian entered into a public works agreement for the construction of Phase 1 ("2005 PWA"). Although the recitals in the 2005 PWA referenced the contemplated development of the three distinct phases, the agreement only addressed the construction obligations associated with Phase 1, as well as the construction of some off-site improvements consisting of road and bridge improvements. Consistent with the Annexation Resolution,

5

the 2005 PWA contemplated that all public facilities[3] would be constructed by Greenway Investments and Hovnanian (defined in the agreement as "Developers"), at the Developers' expense, and after inspection, dedicated to the City, thereby becoming public infrastructure. Notably, the 2005 PWA did not contain any recoupment provision that would permit the Developers to be reimbursed for construction costs associated with Phase 1 infrastructure that might be used by other residential properties developed in later phases. Thereafter, Hovnanian and Greenway Investments proceeded to develop Phase 1 and constructed the infrastructure necessary to serve that residential development, including water, sewer and stormwater facilities, and roads.

### B. Parcels 2 and 3 Conveyed into Separate Ownership

While Greenway Investments pursued subdivision and site plan approval, the company underwent a change in ownership. In February 2005, the four individual members of Greenway Investments entered into a contract with Hovnanian to purchase all the membership interests in Greenway Investments. By January 2006, Greenway Investments was owned by Acacia Credit Fund 10-A, LLC ("Acacia"), an entity affiliated with Hovnanian. The terms and details of the acquisition are not relevant to the issue presented in this case. For our purposes, it is sufficient to note that, by the completion of the various transactions, Hovnanian had acquired title to Parcel 1, and Acacia owned Parcels 2 and 3. The purchase of Parcels 2 and 3 was financed by the former owners of

---

[3] The 2005 PWA described the public facilities to be constructed by the Developers and conveyed to the City, as including a bridge, water, sewer, roads, storm drainage, stormwater management, sediment control, street lighting, street signs, rights-of-way and easements for future utilities, gas, electric, telephone, sidewalks, and cable television.

Greenway Investments, and was evidenced by a promissory note and secured by an indemnity deed of trust which created a lien on Parcels 2 and 3.

In 2007, after Acacia defaulted on the promissory note, the lenders (and former owners of Greenway Investments) commenced foreclosure proceedings on Parcels 2 and 3. After a judicial sale, title to Parcels 2 and 3 was transferred back to the original owners of Greenway Investments, and neither Hovnanian nor Acacia had any further ownership interest in those parcels.

### C. Efforts to Develop Parcels 2 and 3

By 2009, after acquiring Parcels 2 and 3 through the foreclosure sale, the owners of Parcels 2 and 3 (the "Owners")[4] worked with the City to re-start development efforts on those parcels. To that end, the Owners and the Mayor and City Council of Havre de Grace entered into a public works agreement in December 2009 ("2009 PWA") for the construction of 414 dwelling units on Parcels 2 and 3. Pursuant to the terms of the 2009 PWA, the Owners contractually agreed to reimburse the City for certain limited infrastructure expenses related to water improvements and two roads. The Owners also agreed to reimburse Hovnanian

> for the actual cost incurred for the installation and materials necessary to construct those portions of Martha Lewis Boulevard and Mohegan Drive which will solely service Phases 2 and 3 of Greenway Farm and for the actual cost incurred for the installation and materials necessary to construct any water and sewer lines constructed by [Hovnanian] in Phase 1 which will solely service Phases 2 and 3.

---

[4] Following the judicial sale, title to Parcel 2 was conveyed to Greenway Holding Parcel 2, LLC and title to Parcel 3 was conveyed to Greenway Holding Parcel 3, LLC.

7

Although the 2009 PWA contemplated that the Owners would reimburse Hovnanian for certain expenses related to road, water, and sewer improvements that had been constructed as part of Phase 1 and that "solely service[d]" Phases 2 and 3, the agreement did not provide for any specific amount, and contemplated that these fees would be memorialized in a future agreement.

After the execution of the 2009 PWA, the Owners and Hovnanian were not able to reach an agreement on a specific reimbursement amount to be paid by the Owners for their pro rata share of Hovnanian's Phase 1 infrastructure costs. The Owners and Hovnanian sent the City various correspondence and memoranda setting forth their respective positions. The Owners disputed the recoupment amount sought by Hovnanian, believing it to be excessive and inequitable, given Hovnanian's default on its loan obligations, and subsequent foreclosure which the Owners alleged resulted in a monetary loss in excess of $6 million, as well as lapsed permits, which the Owners contended forced them to incur additional expenses.[5]

Given the Owners' and Hovnanian's inability to agree on an amount, in June 2010, the City Attorney wrote to counsel for Hovnanian advising that, in light of the significant

---

[5] In a written memorandum from the Owners to the City Council explaining the Owners' objections to Hovnanian's proposed reimbursement of its infrastructure costs, the Owners contended that the deed of trust instrument represented a non-recourse obligation, meaning that Acacia would not be responsible for any deficiency to the extent that the Owners' loss exceeded the value of the property. The Owners asserted that Hovnanian and Acacia's default on the loan obligation "cost[] them over $6 [m]illion." Additionally, according to the Owners, Hovnanian "allow[ed] its stormwater and erosion control permits to lapse, and otherwise commit[ed] waste on [Parcels 2 and 3], [which] cost the [Owners] approximately $2 [m]illion."

8

difference between the positions asserted by Hovnanian and the Owners, "I strongly suggest that if there is going to be a negotiation of the amount considered by [Hovnanian], as opposed to an amount set by the City, that those discussions take place between [Hovnanian] and [the Owners]."

### D. *The 2010 Recoupment Agreement Presented by Hovnanian*

Undeterred by the lack of an agreement with the Owners, in September 2010, Hovnanian prepared and presented to the Mayor and City Council an agreement titled "Infrastructure Capital Projects Cost Recoupment Agreement[.]" The parties to the Recoupment Agreement were the Mayor and City Council, Hovnanian, and Greenway Investments. Conspicuously absent from this "agreement" were the Owners, whose property was the subject of the agreement.

The recitals in the Recoupment Agreement state that the Owners of Phase 2 and Phase 3 are benefitted by the improvements previously constructed by Hovnanian and that the parties "recognize and acknowledge that it would be inequitable to impose all such costs on [Hovnanian], resulting in a windfall financial advantage for the owner(s) of Phases 2 and 3, unless provisions are made for a pro-rata recovery of such costs by [Hovnanian]." The Agreement recites that the "Mayor and City Council of Havre de Grace have determined that this Agreement is necessary to provide for the general welfare and safety of City residents" and that the agreement is further "required to protect the equitable and legal property rights of [Hovnanian.]"

Under the terms of the Recoupment Agreement, the total amount of Phase 1 infrastructure determined to benefit Phases 2 and 3 is $1,368,094.47. In order to reimburse

9

Hovnanian for this amount, the Recoupment Agreement provides that the City will impose an infrastructure "fee" of $3,304.57 for each residential unit for which a building permit is issued on Parcel 2 or 3 (defined under the Agreement as the "Service Area") over a period not to exceed 21 years. The terms of the Agreement provide that the City will remit the recoupment fees to Hovnanian within 45 days after the end of each calendar quarter. The Agreement further states that the City will not permit any property within the Service Area to use the Phase 1 infrastructure unless and until the recoupment fee is paid to the City.

### E. The October 4, 2010 Verbal Approval by the City Council

After Hovnanian presented the Recoupment Agreement to the City, the City Council voted 6-0 to approve the agreement at a public meeting on October 4, 2010. The City Council's approval was made by a verbal motion and was not accompanied by a written ordinance or resolution.[6]

Soon after the City Council voted on the Recoupment Agreement, it became clear to the City that the Owners—who were not parties to the "agreement" and whose property alone would be subject to "fees" in excess of $1.3 million—did not agree with the terms. On October 15, 2010, counsel for the Owners emailed the City Attorney and city officials "imploring the Mayor to veto the above resolution for many reasons too numerous to put in an email" and requesting "an audience with the Mayor for the purpose of reviewing this

---

[6] The October 4, 2010 minutes reflect that the amounts in the Recoupment Agreement had been reduced by the city public works director to ensure that the total amount represented what was believed to be the pro rata share of the Phase 1 infrastructure costs that were attributable to Phases 2 and 3. The minutes also reflect that the public works director did not believe that the owner of Phase 1 would receive a windfall and that the agreement was similar to other negotiated agreements previously executed by the City.

10

issue." Counsel for the Owners stated that he viewed the Agreement as "a tax used to collect a private (and illegitimate) claim" that would create a "windfall gain" to Hovnanian, and was approved "without due process, either procedural or substantive." Counsel for the Owners stated that the "enactment of this ordinance[7] will, without question, result in needless litigation." In November 2010, the Owners' counsel sent the Mayor and City Council a 16-page memorandum outlining the factual and legal reasons why the Owners contended that the City Council's approval of the Recoupment Agreement was inequitable and illegal. The Owners argued, *inter alia*, that the Agreement constituted the imposition of a tax by a governmental authority for the benefit of a private entity, which the City had no authority to approve under its express ordinance-making powers. The Owners pointed out that they did not agree to pay the fee, and that the City had not incurred any expenses in connection with construction of the infrastructure—which had been wholly constructed and funded by a private developer. According to the Owners, they had "received no notice and [did] not [have] an opportunity to challenge the proposed legislation." The Owners urged the Mayor and City Council to "not implement the Resolution respecting recoupment passed October 4, 2010 and recall the measure."

After the Owners objected to its terms, the Mayor and City Council did not undertake any efforts to execute the Recoupment Agreement. Between December 2010 and May 2011, the City, the Owners, and Hovnanian had discussions concerning Hovnanian's recoupment terms. Separately, the Owners presented the City with a revised

---

[7] As noted herein, although counsel for the Owners referenced an ordinance, no such legislative enactment was undertaken by the Mayor and City Council.

11

site plan for Phases 2 and 3 that would reduce or eliminate the need for residential units constructed in those phases to use infrastructure constructed by Hovnanian in Phase 1. Hovnanian proposed a revision to the Recoupment Agreement which would limit the fees imposed on residential unit owners in Phases 2 and 3 only to those units or lots that actually used the Phase 1 infrastructure.

By May 2011, Hovnanian and the Owners were still at an impasse as far as the Owners' willingness to pay Hovnanian a pro rata share of the Phase 1 infrastructure costs. With no meeting of the minds between the Owners and Hovnanian, Hovnanian sought to enforce the terms of the Recoupment Agreement against the City notwithstanding the fact that the Mayor had not executed it. Specifically, counsel for Hovnanian advised the City Attorney that the City was "in actual or anticipatory breach of the [Recoupment Agreement]," and that, despite the City Council's approval, "the Mayor has not signed the Agreement, thereby preventing its recordation." Counsel for Hovnanian stated that, unless the Recoupment Agreement was signed and returned by May 31, 2011, it would commence litigation against the City. In May 2011, the City Attorney responded and mentioned that the City Council was "contemplating the reconsideration of the resolution that allowed for a recoupment agreement to be presented to the Mayor in the first place." The City Attorney pointed out that Hovnanian had not presented deeds for the dedication of the Phase 1 infrastructure to the City, that the Mayor had not received confirmation from counsel that "the conditions for signature" have been met, and that "filing of suit . . . would negatively [affect] the efforts that have gotten us to this point." In June 2011, counsel for Hovnanian

12

advised that Hovnanian was prepared to dedicate the improvements to the City and argued that the Agreement could not "be unilaterally rescinded" by the City Council.

Despite Hovnanian's insistence that the City had entered into a binding agreement which could not be rescinded, the Recoupment Agreement was never signed by the Mayor, and development commenced on Parcel 3.[8] The City issued 33 building permits on a portion of Parcel 3 but did not collect any recoupment fees. If the City had collected the fees contemplated by the Recoupment Agreement presented to and verbally approved by the City Council in October 2010, the total amount collected for those 33 lots would have been $109,050.81.

## II

## Procedural History

Hovnanian filed a complaint against the City in November 2012. Count one of the complaint sought a declaratory judgment, and requested that the circuit court declare that the Recoupment Agreement is a valid, binding, and enforceable contract, that the Mayor's execution of the Recoupment Agreement is a ministerial duty that the Mayor is required to perform, and that the City is required to record the fully executed Recoupment Agreement in the Land Records for Harford County. The second count of the complaint sought a writ of mandamus to compel the execution and recordation of the Recoupment Agreement. Count three of the complaint alleged breach of contract, requesting damages in the amount of $1,368,094.47 "for the actual and anticipated breach of the Recoupment Agreement."

---

[8] After this litigation commenced, in September 2014, the City Council voted to rescind the October 4, 2010 verbal motion approving the Recoupment Agreement.

Hovnanian and the Mayor and City Council filed cross-motions for summary judgment. After a hearing, the circuit court denied Hovnanian's motion for summary judgment, and granted the City's motion. The circuit court found that "the October 4, 2010 City Council vote to approve the Agreement in question did not create a valid or binding contract and [] the Mayor was under no ministerial duty to sign the agreement." The circuit court considered the authority of the City Council within the context of the provisions of Sections 19 and 34 of the Charter[9] and concluded "that there was not a lawful or binding contract between the parties in this case." Hovnanian appealed the circuit court's entry of summary judgment to the Court of Special Appeals.

In the parties' first trip to the appellate courts, the Court of Special Appeals, in an unreported opinion, vacated the circuit court judgment and remanded the case for further proceedings. *K. Hovnanian Homes of Maryland, LLC. v. Mayor and City Council of Havre de Grace*, No. 1214, 2017 WL 5054229, at *11 (Md. Ct. Spec. App. Nov. 3, 2017). The intermediate appellate court determined that neither of the Charter sections relied upon by the circuit court—§§ 19 and 34—expressly required the Mayor's signature. *Id.* at *9. The Court of Special Appeals declined to consider any other grounds and remanded the matter for further proceedings. *Id.* at *11.

---

[9] Section 19 of the Havre de Grace Charter ("Charter") sets forth the City Council's general authority to adopt resolutions and ordinances, and the manner that such legislative acts may be enacted. Section 34 of the Charter sets forth specific enumerated powers that may be exercised by resolution or ordinance, including matters related to public utilities, water and sewer service, special assessments, streets, and public ways.

After the case was remanded, Hovnanian filed a first amended complaint containing the same counts that were pleaded in the original complaint. In the first amended complaint, Hovnanian contended that, if the circuit court granted the declaratory and mandamus relief and required the execution and recordation of the Recoupment Agreement, it was entitled to the fees that were not collected for the initial 33 building permits that had been issued in Phase 3 after October 2010, totaling $109,050.81, plus per diem interest from August 20, 2012, at a statutory rate of 6%.

Once again, the parties filed cross-motions for summary judgment. This time, in a complete reversal of its previous interpretation of the Charter, the circuit court entered summary judgment in favor of Hovnanian and declared that the Recoupment Agreement was a binding and enforceable contract as of October 4, 2010 when the City Council unanimously approved the Agreement by verbal motion. The circuit court declared that the execution of the Agreement by the Mayor was a ministerial duty and that the Mayor's refusal to sign constituted a breach of the Agreement by the Mayor and City Council. The circuit court issued a writ of mandamus directing the Mayor to execute the Agreement and record it in the land records. The circuit court entered judgment in favor of Hovnanian and against the Mayor and City Council in the amount of $144,822.32, representing uncollected recoupment fees on the 33 building permits that had been issued, plus per diem interest, accounting from August 29, 2012 (the date that the last of the 33 permits was issued), through the date of judgment. The Mayor and City Council appealed.

In a reported opinion, the Court of Special Appeals reversed the judgment of the circuit court. *Hovnanian*, 246 Md. App. at 159. The Court of Special Appeals considered

15

the Recoupment Agreement, and the City's authority to execute it, within the context of the Charter. *Id.* at 149–56. Based upon its reading of the Charter, the intermediate appellate court concluded that the structure of the Havre de Grace city government—which established a Mayor and City Council—was "typical of a strong mayor system[.]" *Id.* at 150. The Court of Special Appeals commented that "[e]ntering into contracts is an executive branch function." *Id.* at 154. Accordingly, the court reasoned that the Mayor, as the executive branch official, or his subordinate, must enter into the Recoupment Agreement. *Id.* at 158–59. Because the Mayor did not execute the Agreement, the Court of Special Appeals held that the City could not be bound. *Id.* at 159.

Hovnanian filed a petition for writ of *certiorari*, which we granted to determine whether the Recoupment Agreement is a valid and enforceable contract against the Mayor and City Council. As discussed below, although we land in the same place as the Court of Special Appeals, we follow a different path to get there.

## III

### Discussion

#### A. *Standard of Review*

The circuit court issued its decision after the parties filed cross-motions for summary judgment. A case may be resolved on summary judgment when there is no dispute of material fact and the moving party is entitled to judgment as a matter of law. Maryland Rule 2-501(f). There are no material disputes of fact and the issue presented in this case is purely legal. "Accordingly, we review [the] legal issue without according any special deference to the conclusions of the [c]ircuit [c]ourt or the Court of Special

16

Appeals." *Waterman Family Limited Partnership v. Boomer*, 456 Md. 330, 340 (2017) (citation omitted).

### B. Parties' Contentions[10]

Hovnanian contends that the City Council's verbal motion to approve the Recoupment Agreement on October 4, 2010 created a binding and enforceable agreement against the City. To support its position, Hovnanian directs us to the various sections of the Charter, including § 33, which gives the City Council the broad "power to pass all ordinances and resolutions," as well as § 34, which sets forth the specific authority to "pass and create resolutions and ordinances" related to "property, property acquisition, . . . public utilities, . . . sewer and sewer service, . . . streets or public ways, . . . [and] water service." Hovnanian asserts that the City Council had the authority to adopt the Recoupment Agreement by verbal motion, and that the City Council was the governing body with the authority to enter into such an agreement. According to Hovnanian, to the extent that the Charter does not provide a clear answer as far as how municipal contracts are made, this Court should apply common law principles to "fill th[e] gap[.]" Hovnanian urges the Court to fill these gaps by looking to contract principles set forth in 10 McQuillin, *The Law of*

---

[10] During oral arguments in this case, this Court asked counsel questions concerning the applicability of the express powers delegated to municipal legislative bodies by the General Assembly, which are enumerated in Title 5, Subtitle 2 of the Local Government Article. In light of the Court's questions, Hovnanian filed a motion requesting that the Court consider supplemental arguments on the express powers granted to municipalities under state law. The Court granted Hovnanian's motion and accepted additional written arguments from Hovnanian and the Mayor and City Council. We discuss the parties' additional arguments concerning the General Assembly's delegation of express powers as those matters are discussed in this opinion.

17

*Municipal Corporations* (3d. ed. rev. 2006) ("*McQuillin*"). Hovnanian points out that under McQuillin, "[g]enerally, the power to make contracts on behalf of a municipality rests in the council or the governing body." 10 *McQuillin*, § 29:19. Hovnanian cites McQuillin for the general proposition that the terms of a proposed contract can be adopted by ordinance, resolution, or motion. *Id.* § 29:3. According to Hovnanian, there is no substantive difference between a verbal motion and a resolution and either method could have been used in this instance by the City Council to adopt the Recoupment Agreement. Relying on our discussion and analysis in *Inlet Associates v. Assateague House Condominium*, 313 Md. 413 (1988), Hovnanian also argues that it was appropriate for the Council to adopt the Recoupment Agreement by verbal motion and that a formal ordinance was not required to create a binding and enforceable agreement against the Mayor and City Council. Hovnanian asserts that under the Charter, the Mayor did not have the sole authority to execute the Recoupment Agreement, and that the Court of Special Appeals erred in concluding that the authority to enter into the same was an "executive function" within the exclusive authority of the Mayor.

The Mayor and City Council direct us to the same provisions of the Charter—§§ 33 and 34—and assert that under those provisions, the City Council is not given any general power to enter into any contracts, nor is it given any executive power. The City argues that the Court of Special Appeals correctly determined that the execution of contracts is an executive function that lies within the authority of the Mayor. Alternatively, in the event that this Court determines that the City Council was required to approve the Agreement, the City points out that the City Council rescinded its approval by verbal motion in

18

September 2014. The City also asserts that, at a minimum, the Mayor and City Council are required to act in concert with one another as the City's governing body.

## C. Analysis—The Importance of Starting in the Right Place

As is often the case with any complex legal issue, if one starts the inquiry in the wrong place, it is easy, as they say, to "miss the forest for the trees."[11] In this case, the parties and the lower courts started their analysis of the City's authority to enter into the Recoupment Agreement from the forest floor, examining the municipal charter as if it were a tree, attempting to discern the general municipal authority to execute contracts by studying its branches. As our cases illustrate, the correct starting point for our inquiry into municipal authority starts high above the forest canopy—with an examination of the Maryland Constitution and the express powers delegated by the General Assembly to Maryland municipalities. It is necessary to start any analysis from these sources of authority because any interpretation of the Charter, and application of secondary sources

---

[11] The idiom "don't miss the forest for the trees" has its origin in a passage from Sir Thomas More's "Confutation of Tyndale's Answer," published in 1533, which is More's response to William Tyndale's writings criticizing the Catholic Church. In the second volume of the text, More writes:

> And as he myght tell vs, that of Poules chyrch we may well se
> the stones, but we can not se the chyrce. And then we may well
> tell hym agayne, that he can not se the wood for the trees.

In its modern parlance, Merriam-Webster describes the idiom as "to not understand or appreciate a larger situation, problem, etc., because one is considering only a few parts of it." *Miss the forest for the trees*, Merriam-Webster, available at https//perma.cc/49D3-YYMU.

19

as gap fillers, as suggested by Hovnanian, must be consistent with the Maryland Constitution and the express powers delegated to municipalities by the General Assembly.

1. *The Municipal Home Rule Amendment and Express Ordinance-Making Powers Granted to Municipalities*

Municipalities derive their authority from the Municipal Home Rule Amendment, Article XI-E of the Constitution of Maryland, which was ratified by the people on November 2, 1954. Under the Home Rule Amendment, Art. XI-E, § 3, the legislative body of a municipality may adopt, amend, or repeal its charter, consistent with the authority granted by the Maryland Constitution and the express powers conferred by the General Assembly. As we have stated on numerous occasions, "[m]unicipalities possess only such powers as have been conferred upon them by the Legislature." *River Walk Apartments, LLC v. Twigg*, 396 Md. 527, 543 (2007); *see also Hardy v. Hous. Mgmt. Co.*, 293 Md. 394, 396 (1982) (noting "[i]t is well established under our decisions that a municipal corporation has but limited authority"); *Birge v. Town of Easton*, 274 Md. 635, 639 (1975) (explaining that "a municipal corporation[] possesses only limited powers"); *McRobie v. Mayor and Commissioners of Westernport*, 260 Md. 464, 466 (1971). This Court has often quoted 1 J. Dillon, *Municipal Corporations* § 237 (5th ed. 1911) as follows:

> A municipal corporation . . . can exercise the following powers, and no others: First, those granted in express words: second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the accomplishment of the declared objects and purposes of the corporation,—not simply convenient, but indispensable.

*See Hardy*, 293 Md. at 396–97; *Birge*, 274 Md. at 639–40; *City of New Carrollton v. Belsinger Signs, Inc.*, 266 Md. 229, 237 (1972); *McRobie*, 260 Md. at 466.

20

The Home Rule Amendment, Article XI-E, was implemented by former Maryland Code Article 23A (1957). *Inlet Assocs.*, 313 Md. at 425. As we explained in *Inlet Associates*, former Article 23A, § 1[12] empowered municipal corporations "to pass and adopt all ordinances, resolutions or bylaws necessary or proper to exercise the powers granted herein or elsewhere." 313 Md. at 425. Section 2 of former Article 23A implemented Article XI-E by an express grant of powers to municipalities. *Id.* "This section enumerate[d] a number of 'express ordinance-making powers' ranging in subject matter from advertising through zoning; it authorize[d] the municipality 'to pass such ordinances not contrary to the Constitution of Maryland, public general law, or public local law as they may deem necessary' for municipal purposes." *Id.* (quoting former Article 23A, § 2).

In 2013, Article 23A was repealed and its provisions were re-codified in a new article of the Maryland Code designated as the "Local Government Article." 2013 Md. Laws 584–2120. The preamble to this legislative overhaul, which repealed and re-codified the various authority granted to local governments, including municipalities,[13] reflects the Legislature's intention to adopt the new "'Local Government Article'[] to revise, restate, and recodify the laws of the State relating to[,]" in pertinent part, "municipal charters and

---

[12] Former Article 23A, § 1 was re-codified without substantive change in Local Government Article ("LG") § 4-103(b). *See* 2013 Md. Laws 584–2120.

[13] The legislative enactment of the new Local Government Article included a re-codification of laws relating not only to authority granted to municipal governing bodies, but also to the authority granted to the governing bodies of charter, code, and commission counties. *See* 2013 Md. Laws 584–2120.

21

the establishment of home rule by municipalities," including "the authority of municipalities to pass ordinances for certain purposes[.]" 2013 Md. Laws 572–73.

The express ordinance-making powers formerly described in Article 23A, § 2 are now codified in Local Government Article ("LG") Title 5, Subtitle 2 titled "Enumeration of Express Law Making Powers." Consistent with the legislative preamble, the revisor's notes for each section of Local Government Article Title 5, Subtitle 2 reflect that the language contained in the new section is "new language derived without substantive change from former Art[icle] 23A, § 2[.]" 2013 Md. Laws 787.

LG § 5-202 confers upon the "legislative body of a municipality" the general authority to "adopt *ordinances* to:

(1) assure the good government of the municipality;
(2) protect and preserve the municipality's rights, property, and privileges;
(3) preserve peace and good order;
(4) secure persons and property from danger and destruction; and
(5) protect the health, comfort, and convenience of the residents of the municipality."

(Emphasis added). In addition to the legislative grant of general ordinance-making powers, the General Assembly has granted express ordinance-making authority to municipal legislative bodies for *specific types* of legislative enactments outlined in Title 5, Subtitle 2 of the Local Government Article. *See* LG § 5-203(a) ("In addition to, but not in substitution of, the powers that have been or may be granted to it, the *legislative body of a municipality* may exercise the express powers provided in this subtitle *by adopting ordinances*.") (Emphasis added).

22

Consistent with the former provisions of Article 23A, § 2, the Legislature has conferred both a municipality's general authority, as well as its specific grant of express powers, in "the *legislative body of a municipality*." *See* LG §§ 5-202, 5-203 (emphasis added). *See also Twigg*, 396 Md. at 545 (explaining that the express powers enumerated in Section 2 of Article 23A are conferred upon the municipal legislative body). Not only are the express law-making powers bestowed upon the legislative body of a municipality, the express powers enumerated in Title 5, Subtitle 2 *must be exercised by ordinance*.[14] *See*

---

[14] As previously noted, the Legislature provided the governing bodies of municipalities with general ordinance-making power in former Article 23A, § 2(a). In addition to the general ordinance-making authority, the Legislature identified 38 express powers that were granted to the municipal legislative body that were required to be exercised by ordinance if the legislative body elected to exercise its grant of authority. *See* Article 23A, § 2(b) ("In addition to, but not in substitution of, the powers which have been, or may hereafter be, granted to it, such legislative body also *shall have the following express ordinance-making powers*[.]") (Emphasis added). With the enactment of the new Local Government Article in 2013, the express ordinance-making powers enumerated in Article 23A, § 2(b)(1)–(38) were transferred into the various sections of Title 5, Subtitle 2 of the Local Government Article. *See* 2013 Md. Laws 584–2120. The revisor's note for each section reflects that it was derived without substantive change from its respective counterpart in former Article 23A, § 2(b). *Id.* The transfer of the express ordinance-making powers from Article 23A, § 2(b)(1)–(38) into Title 5, Subtitle 2 of the Local Government Article did not change the requirement that the municipal legislative body must exercise these express powers by ordinance. Although the phraseology changed slightly (*compare* Article 23A, § 2(b) ("[the] legislative body *also shall have the following express ordinance-making powers*") *with* LG § 5-203(a) ("the legislative body of a municipality *may exercise the powers provided in this subtitle by adopting ordinances*[]")), the requirement that the municipal legislative body exercise its express powers by ordinance did not change. (Emphasis added). As we explained in *Allen v. State*, 402 Md. 59, 71–72 (2007):

> This Court often has had occasion to consider the impact of recodifications on the meaning of included statutory provisions vis a vis prior iterations of the relevant statutes. When a substantial part of an Article is revised, a change in the

23

LG § 5-203(a). Additionally, where the General Assembly has provided a municipality with the authority to exercise an express power by ordinance, the ordinance "may not conflict with State law." LG § 5-203(b).

To summarize these general principles, the applicable provisions of a municipal charter must be read within the context of any limitations prescribed by the Municipal Home Rule Amendment, as well as any other specific delegations of authority provided by the General Assembly. Where the General Assembly has delegated authority to the governing body of a municipality and has expressly stated that the authority must be exercised by ordinance, the text of the municipal charter must be construed in a manner consistent with the express provisions of state law.

2. *Whether the Recoupment Agreement is an Enforceable Contract Against the City*

With these principles in mind, we return to the issue at hand—whether the Recoupment Agreement is an enforceable agreement against the City. To answer this question, we must ascertain whether the municipality had the legal authority to enter into such an agreement and whether the municipality exercised its authority in accordance with

---

phraseology of a statute as part of a recodification will ordinarily not be deemed to modify the law unless the change is such that the intention of the Legislature to modify the law is unmistakable. Furthermore, recodification of statutes is presumed to be for the purpose of clarity rather than change of meaning and, thus, even a change in the phraseology of a statute by a codification will not ordinarily modify the law unless the change is so radical and material that the intention of the Legislature to modify the law appears unmistakably from the language of the Code.

(Cleaned up).

24

the law.  As reflected in our analysis in similar cases, discussed in section III, C.2.d *infra*, we undertake our inquiry as follows.  First, we consider the *nature or typ*e *of governmental action* that is at the heart of the dispute.  As part of this inquiry, we strip away any forms or labels attached to the action—such as "contract" or "agreement" or "resolution"—and look at the *substance of the action* being undertaken by the municipality.  Once we identify the precise nature of the municipal action in question, the second part of our analysis requires that we determine whether the municipality has the *legal authority* to undertake the action, and if so, whether the contemplated action was *correctly undertaken* consistent with the grant of authority.

a.  The Nature of the Governmental Action—The Imposition and Collection of a Fee

As described above, Hovnanian seeks to recover from adjacent property owners, a portion of the infrastructure expenses that it incurred in connection with its development activities on Parcel 1.  Unable to reach an agreement with the Owners, Hovnanian enlisted the City of Havre de Grace to use its governmental authority to levy fees on the adjacent properties, which would in turn, be remitted to Hovnanian.  Hovnanian proposes that the City impose and collect a "recoupment fee" in the amount of $3,304.57 for each residential dwelling unit constructed on Parcels 2 and 3.  The Recoupment Agreement provides that the fee will be paid to the City at the same time that a building permit is issued for any new construction on Parcels 2 and 3, for a term of 21 years.  The Agreement states that the fees will be paid to Hovnanian within 45 days after each calendar quarter in which fees are collected.

Stripped of its label, the substance of the governmental action in question is the imposition and collection of a fee on property owners who are not parties to the "agreement," and who have not consented to the payment of the fee. If Parcels 2 and 3 are fully developed, these fees would be imposed upon up to 414 residential unit owners, totaling over $1.3 million. Having identified the nature of the governmental action that Hovnanian seeks to enforce, we turn to the specific constitutional and statutory parameters that must be satisfied when a municipality attempts to levy a fee.

b. The Imposition of Fees by Municipal Governments—Constitutional and Statutory Restrictions

As noted above, the municipal power implicated in this case is the power to levy a fee on a new development. There are both constitutional and statutory limitations on a municipality's ability to levy taxes and fees. Article 14 of the Maryland Declaration of Rights states that "no aid, charge, tax, burthen or fees ought to be rated or levied, under any pretense, without the consent of the Legislature." Section 5 of Article XI-E of the Maryland Constitution grants the General Assembly the power to authorize municipalities to levy taxes and fees:

> No . . . municipal corporation shall levy any type of tax, license fee, franchise tax or fee which was not in effect in such municipal corporation on January 1, 1954, *unless it shall receive the express authorization of the General Assembly for such purpose*, by a general law which in its terms and its effect applies alike to all municipal corporations in one or more of the classes provided for in Section 2 of this Article.

(Emphasis added). As we have explained in other cases, "a municipality may levy only such type of tax, license fee, franchise tax or fee that is specifically authorized by the General Assembly." *Twigg*, 396 Md. at 544 (quoting *Tidewater/Havre de Grace, Inc. v.*

26

*Mayor and City Council of Havre de Grace*, 337 Md. 338, 343 (1995)); *see also Campbell*

*v. Mayor & Aldermen of Annapolis*, 289 Md. 300, 305 (1981).  In *Campbell*, we explained

that, by using the words "tax" and "license fee" individually, and further use of "franchise

tax or fee," the constitutional language reflects "an intention to encompass both revenue-

raising and regulatory levies."  289 Md. at 305.

As part of its express ordinance-making powers, the General Assembly has

delegated to municipal legislative bodies the authority to "establish and collect *reasonable*

*fees and charges:* (i) for franchises, licenses, or permits granted by the municipality; or (ii)

associated with the exercise of a governmental or proprietary function exercised by a

municipality."  LG § 5-205(d)(1) (emphasis added).[15]  Because the Legislature specifically

delegated the authority to adopt municipal fees and charges to the municipal legislative

body, and requires that these fees be adopted by ordinance, the municipal authority must

be exercised in accordance with that express grant of authority.  Simply put, the

establishment of fees and charges must be undertaken by the municipal legislative body

and enacted pursuant to an ordinance.  *See* LG §§ 5-203(a), 5-205(d).[16]

---

[15] Prior to the 2013 re-codification of Article 23A, a municipality's authority to establish and collect reasonable fees and charges was number 33 in the express ordinance-making powers established by the General Assembly.  *See* Article 23A, § 2(b)(33).

[16] In addition to the general authority to establish a fee by ordinance under LG § 5-205(d), other provisions of state law impose additional public notice and hearing requirements when a municipality proposes to enact fees or charges for governmental purposes.  For example, the General Assembly has authorized the governing body of a municipality to establish reasonable connection charges and annual assessments for connections with the municipal water or sewage systems where the system is operated and financed by the municipality.  *See* Environment Article ("EN") § 9-722(a).  The

c. The Provisions of the Charter Must be Read Consistently with the Express Authority Granted Under State Law

Against the parameters of Article XI-E, Section 5 and the express powers granted by the General Assembly, we turn to the language of the Charter. When read against the backdrop of its constitutional and statutory authority, the Charter provisions clearly contemplate that legislative acts, such as the imposition of fees and charges, must be undertaken by an ordinance adopted by the Mayor and City Council. Section 1 of the Charter vests the "Mayor and City Council of Havre de Grace" with "all the powers provided by law to a municipal corporation." Charter, § 1. Under the Charter, the City Council has "the power to pass and create resolutions and ordinances not contrary to the laws and Constitution of the state related to the following subject matters[:] . . . public utilities, . . . sewers and sewer service, . . . special assessments, . . . streets or public ways[.]" Charter, § 34. By law, these powers are required to be exercised by the municipal governing body known as the "Mayor and City Council of Havre de Grace." Because state law requires that fees and charges be adopted by ordinance, the Charter must be similarly construed as requiring that these powers be exercised by ordinance.

---

municipality also has the authority to establish an annual assessment on all property, improved or unimproved, which abuts on any street, road, lane, alley, or right-of-way in which there is a water main or sewer. EN § 9-722(a)(2). Prior to setting such rate or assessment, it must be advertised in a newspaper of general circulation and a public hearing must be conducted. EN § 9-727. Although the "recoupment fee" proposed in this case appears to cover public infrastructure costs (after dedication and acceptance into the municipal system), we do not need to determine the precise nature of the "recoupment fee" sought to be levied. It is sufficient for our purposes to simply note that any fee that is proposed to be levied would need to be undertaken by the municipal governing body and pursuant to a lawfully enacted ordinance.

28

The Charter gives the Mayor and City Council the specific authority to levy and collect "taxes in the form of special assessments upon property" to pay for public improvements such as water, sewer, stormwater, and sidewalks that benefit a certain area. Charter, § 35. Again, reading those provisions through the prism of the express powers conferred by the General Assembly, these powers must be exercised by the municipal legislative body pursuant to an ordinance.

With respect to water and sewer, Charter, § 70 gives the Mayor and City Council the following specific authority:

> The *Mayor and City Council may enact Ordinances* providing for the regulations and control of waters and sewers. In addition, the *Mayor and City Council* may enter into contracts for the purpose of providing water and sewer services to new service areas.[17] Such contracts may provide for advance

---

[17] We reject the Court of Special Appeals' analysis and conclusion that the Mayor alone had the authority to execute the Recoupment Agreement as an "executive function[.]" *Mayor and City Council of Havre de Grace v. K. Hovnanian Homes of Maryland, LLC*, 246 Md. App. 144, 158–59 (2020). It is inconsistent with our analysis in *River Walk Apartments, LLC v. Twigg*, where we held that a mayor did not have the authority to enter into an agreement which, *inter alia*, waived impact fees and created special assessments because the establishment of fees required legislative enactment of an ordinance under the express powers delegated to municipalities under state law. 396 Md. 527, 549 (2007). Like the agreement in *Twigg*, the substance of the Recoupment Agreement also involves the governmental imposition and collection of a fee against property owners. The General Assembly has given this authority to levy fees and charges to the municipal legislative body—which, in this case, is the Mayor and City Council of Havre de Grace. *See* LG §§ 5-203, 5-205(d). Whether the Charter provides for a "strong mayor" form of government is irrelevant. Where the General Assembly has given the municipal legislative body the authority to act, the legislative body must take such action. Moreover, the applicable provisions of the Charter are consistent with the express powers. The Charter gives the "Mayor and City Council" the authority to enter into water and sewer contracts, *not* the Mayor alone. *See* Charter, § 70. We also note that the City is aware of this requirement, as is demonstrated by the fact that various public works

29

payment of capital cost recovery charges, the construction of capital improvements to water and sewer facilities, and for crediting such advance payments and the value of such capital improvements to capital cost recovery charges which become payable in the future.

(Emphasis added). And finally, Charter, § 71 provides that

The City, *by ordinance*, may provide for the collection and disbursement of capital cost recovery charges for the purpose of recovering the capital cost of facilities needed to provide water and sewer service. Such charges may be collected on either a periodic basis or on the basis of a one time charge paid immediately prior to connection, or both.

(Emphasis added). Reading the above-referenced sections of the Charter within the larger context of the Maryland Constitution and the express ordinance-making powers conferred by the General Assembly, it is clear that the Mayor and City Council of Havre de Grace is the municipal legislative body that must establish fees and charges, and that the legislative mode for establishing such charges is pursuant to a duly enacted ordinance. These powers cannot be exercised by the Mayor, nor can they be exercised by a verbal resolution of the City Council, as the exercise of the power in either manner would be inconsistent with the statutory requirement that the establishment and collection of reasonable fees be undertaken by the legislative body by ordinance. LG §§ 5-203(a), 5-205(d).[18]

---

agreements contained in the record are executed by the municipal body known as the "Mayor and City Council of the City of Havre de Grace."

[18] In its supplemental arguments concerning the application of the express powers granted by the General Assembly, Hovnanian points out that under LG § 4-103(b) the Maryland General Assembly delegated to municipalities the general authority to "enact and adopt ordinances, resolutions, or bylaws necessary to exercise the authority of the municipality." Read within the context of this general authority, Hovnanian argues the

We note that the requirement that fees be adopted by ordinance rather than by a resolution is not a distinction rooted in form over substance. The adoption of an ordinance is accompanied by certain formalities, including public notice and hearing requirements. Under the Charter, § 19 (other than emergency provisions not relevant here), an ordinance may not be adopted at the meeting where it was first introduced. The Charter gives the Mayor veto authority over an ordinance, which can be overridden by a vote of five affirmative votes of members of the Council. By contrast, if such fees could be established by a resolution in the form of a verbal motion (the position taken by Hovnanian), a municipal body could circumvent the formal ordinance requirements, including public notice and hearing requirements, as well as the veto power afforded to the Mayor when an ordinance is required. These protections would also be circumvented if we adopted the Court of Special Appeals' analysis and determined that the Mayor could, by contract, impose such fees as an "executive function" independent from approval by the City

word "may" as used in the express powers language in LG § 5-203(a) is intended to reflect permissible language indicating that the exercise of the express powers contained in Title 5, Subtitle 2 of the Local Government Article *may* be adopted by *either* ordinance *or* resolution (such as a verbal motion). We reject this interpretation as being inconsistent with the express language of the statute, the language of predecessor statute, Article 23A, § 2(b), and our longstanding jurisprudence interpreting the express ordinance-making powers under that statute. As noted in footnote 14, the language in LG § 5-203(a) was derived without substantive change from Article 23A, § 2(b). The change in phraseology did not signify a legislative intention to abandon the requirement that the express powers be exercised by ordinance. Rather, the use of the word "may" reflects the legislative intention that a municipality *may* exercise the express powers delegated in former Article 23A, § 2(b) (now, contained in LG Title 5, Subtitle 2), but it is not *required* to do so. In other words, a municipality is not obligated to exercise all the express powers delegated by the General Assembly. However, if it elects to exercise them, the legislative mode of enactment is by ordinance.

Council. *Hovnanian*, 246 Md. App. at 158–59. We reject both interpretations of the Charter as being inconsistent with Article XI-E of the Maryland Constitution and the express powers described in Local Government Title 5, Subtitle 2. The provisions of the Charter, when read in the context of the Maryland Constitution and State law, require that the imposition and collection of fees be adopted by an ordinance, and further require that contracts related thereto be executed by the Mayor and City Council.

d. Municipal Action Taken in a Manner Inconsistent with the General Assembly's Delegation of Express Powers is *Ultra Vires*

Although the specific contract in this case has not been considered by this Court, we have analyzed other contracts that were sought to be enforced against municipal governments in a similar fashion. *See Inlet Assocs.*, 313 Md. 413; *Twigg*, 396 Md. 527. As these cases demonstrate, where a party is seeking to enforce a contract against a municipality in which the substance of the contract was required to be adopted by an ordinance, and no such ordinance was enacted, the contract is *ultra vires* and unenforceable.

In *Inlet Associates*, a hotel and marina developer requested that the Ocean City Council enter into an agreement that would, in part, permit the city to convey to the developer a portion of a public right-of-way and public riparian rights in exchange for the developer providing enhanced public amenities. 313 Md. at 419. After a duly advertised public hearing, the city council verbally voted to approve the conveyance at a meeting. *Id.* at 419–20. Following the verbal resolution, the developer proceeded to purchase property and spent over one million dollars on plans to develop the project. *Id.* at 420.

32

A year later, the developer requested a change in the construction plans (to construct a restaurant instead of some shops). *Id*. at 421. A question arose whether the initial approval was required to be undertaken by an ordinance, as opposed to a simple resolution, because the matter involved the disposition of public property. *Id.* The city attorney advised that, under his interpretation of the charter, the disposition of public property could be undertaken by resolution after public notice and a public hearing. *Id.* The city attorney proceeded to prepare an agreement and a quitclaim deed for the respective transfer of public property. *Id.* at 422. The developer promptly signed the agreement and returned it to the city. *Id.* The Mayor of Ocean City declined to sign the documents, believing that the property transfers could only be accomplished by a duly enacted ordinance. *Id.* A lawsuit followed, in which plaintiff taxpayers and property owners sought to enjoin the execution of the contract, and a declaration that an ordinance was required to approve the transfer of property. *Id.* The developer intervened and filed a cross-claim and counterclaim against Ocean City, alleging that it had expended over $1 million in reliance upon the City Council's favorable verbal resolution and that no ordinance was required to convey the property. *Id.* at 423–24. We granted *certiorari* to consider the issue of whether an ordinance was required to convey property. *Id.* at 424.

Like Hovnanian in this case, the developer in *Inlet Associates* argued that an ordinance was not required for the agreement to be valid. *Id.* The developer asserted that the Ocean City Charter provisions were ambiguous as to whether an ordinance was required and contended that, because the City had never previously required an ordinance for the conveyance of property, it was equitably estopped from taking the position that an

33

ordinance was required for the transaction in question.  *Id.* at 424–25.  We rejected the developer's argument and concluded that an ordinance was, in fact, required, and that the City Council's action to approve the conveyance by verbal resolution was *ultra vires* and invalid.  *Id.* at 434.

We started our analysis with the Municipal Home Rule Amendment, Article XI-E, of the Maryland Constitution, and the express ordinance-making powers enumerated in Article 23A, § 2.  We pointed out that one such power, granted in former Article 23A, § 2(b)(24), authorized a municipality to sell at a public or private sale after 20 days' public notice, real property belonging to the municipality, after the "legislative body determines that the same is no longer needed for any public use."  *Id.* at 425–26.

We examined the Ocean City Charter within the context of the express powers articulated in former Article 23A, § 2, as well as the general common law differences between a resolution and an ordinance.  *Id.* at 427–31.  We observed that a resolution passed by a legislative body "deals with matters of a special or temporary character and generally speaking, is simply an expression of opinion or mind concerning some particular item of business coming within the legislative body's official cognizance, ordinarily ministerial in character and relating to the administrative business of the municipality."  *Id.* at 427–28 (citing *McQuillin,* § 15.02 (3d ed. 1981)) (cleaned up).  We explained that administrative or ministerial powers possessed by a governing body of a municipality may be exercised by resolution.  *Id.* at 428 (citing 1. C. Antieau, *Municipal Corporation Law*, § 414 (1988)).

By contrast, we noted that "[a]n ordinance is distinctly a legislative act; it prescribes 'some permanent rule of conduct or government, to continue in force until the ordinance is repealed.'" *Id.* (quoting *McQuillin*, § 15.02). We observed that "[m]unicipal charters generally 'contemplate that all legislation creating liability or affecting in any important or material manner the people of the municipality should be enacted by ordinances.'" *Id.* (citing *McQuillin*, § 15.02). We pointed out that "a common distinction between a resolution and an ordinance is that only the latter need be signed by the Mayor or passed over his veto." *Id.* (citing *McQuillin*, § 15.02). We also explained that "municipal enactments *must be in the form of ordinances when so required either by charter or statute* . . . . Otherwise stated, whenever the controlling law directs the legislative body to do a particular thing in a certain manner the thing must be done in that manner." *Id.* (emphasis added) (citation omitted). We commented that, "our cases recognize that *if a municipal action is one of general application prescribing a new plan or policy, it is considered legislative and therefore must be accomplished by ordinance*." *Id.* at 428–29 (emphasis added) (citations omitted).

In examining the applicable provisions of the Ocean City Charter and the express powers set forth under Article 23A, we determined that there was no provision that addressed the particular action sought to be undertaken by the city—in essence, a "swap" of public land and riparian rights for enhanced public amenities, including a bay-front public boardwalk. *Id.* at 429–30. We stated that "[i]n considering the legality of the action taken by the City Council, . . . and in particular whether [under] the circumstances the

35

conveyances could properly be authorized by resolution, *we look to the substance of what the City Council undertook to achieve by its action.*" *Id.* at 430 (emphasis added).

Examining the substance of the transactions contemplated under the proposed agreement, we determined that the agreement between the developer and the city "encompassed more than merely a street closing and assignment of municipal riparian rights." *Id.* at 431–32. We concluded that the proposed conveyances provided a "quid pro quo" for the developer's willingness to provide public amenities as part of a comprehensive redevelopment of downtown Ocean City. *Id.* at 432. We observed that, if implemented, the redevelopment plan "involved more on the part of the Council than the mere ministerial or administrative execution of an existing law." *Id.* Accordingly, we concluded that "[l]egislative action by the Council was required consistent with the requirements of Article 23A, § 2(b)(24) and [the applicable provisions] of the City Charter to sanction the 'swap' of City property for the public amenities to be provided and maintained by [the developer]." *Id.* As such, we held that "a simple resolution, neither reduced to writing nor journalized as required by the City Charter, cannot suffice to validate the City's actions. An ordinance was thus fundamental to the legality of the conveyances here in question; without it, the City Council's action was without legal effect." *Id.* at 434.

Hovnanian argues that our analysis in *Inlet Associates* supports the conclusion that the City Council had the authority to approve the agreement by resolution. According to Hovnanian, the Recoupment Agreement falls within the types of governmental action that can be adopted by resolution because the subject matter does not involve a matter of "general application." We reject Hovnanian's argument for two reasons. First and

36

foremost, we do not apply common law definitions of "resolution" and "ordinance" in a manner inconsistent with the express powers contained in Title 5, Subtitle 2 of the Local Government Article, which *require* that fees and charges be established by ordinance. *See* LG §§ 5-203(a), 5-205(d)(1). As we noted in *Inlet Associates*, when a statute requires that action be undertaken by ordinance, such a legislative enactment is required. 313 Md. at 428–29. Second, even assuming that the General Assembly had not delegated the express power to a local municipal body to adopt fees and charges by ordinance, under the common law definitions of "resolution" and "ordinance" that we articulated in *Inlet Associates*, the governmental action in this case, nonetheless, falls within the description of an action which requires the enactment of an ordinance. The governmental action here *is* one of general application that would prescribe a new plan or policy—the imposition of a fee that could be collected from the owners of 400 residential units or building lots within the City upon the issuance of a building permit for a period of 21 years.

Hovnanian's position is also inconsistent with our analysis in *Twigg*, 396 Md. 527. In that case, a property owner filed an action for mandamus and specific performance against the City of Frederick seeking to enforce two agreements that had been executed on two separate occasions by two different mayors of the City of Frederick, in which the city purported to waive impact fees and create a special tax district in exchange for the property owner's agreement to dedicate certain rights-of-way to the city. *Twigg*, 396 Md. at 531–32; 535–36. The agreements had been signed by the respective mayors in office at the time of the agreements' execution. *Id.* at 533. Years later, after a successor owner sought to enforce the agreements in connection with development of the property, and the city

37

attempted to collect the impact fees that it ordinarily charged prior to the issuance of the building permit, the developer sued to enforce the agreements which waived the fees. *Id.* at 535. The circuit court entered summary judgment in favor of the developer, concluding that the city, through its mayors, had entered into "valid and enforceable" agreements with the developer, and that "like any other individual or entity, [it had to] live up to the terms of its agreements." *Id*. at 536–37. The city appealed the circuit court's decision to the Court of Special Appeals, maintaining that under the express ordinance-making powers enumerated in Article 23A, § 2, the legislative bodies are required to establish fees by ordinance. *Id.* at 537. Because the city was required to establish fees by ordinance, by corollary, the city contended that any waiver of fees similarly required the enactment of an ordinance by the legislative body. *Twigg v. Riverside Apartments, LLC*, 168 Md. App. 351, 446 (2006). The Court of Special Appeals agreed with the city, and determined that because Article 23A, § 2 and the Frederick City Charter mandated that fees be established by ordinance, and because no ordinance authorized the agreements waiving the fees, the agreements were *ultra vires* and void. *Twigg*, 396 Md. at 538. We granted *certiorari* to determine whether the agreements were enforceable against the city. *Id.* at 530.

Relying solely on the language in the Frederick City Charter, the developer argued that the mayor had the executive power to enter into the agreements, and that as an executive act, no ordinance or legislative act was required in order for the city to enter into the agreements. *Id.* at 540. We rejected this argument.

Undertaking the same type of analysis outlined in *Inlet Associates*, we examined the substance of the municipal action in question, looked beyond the label of "contract" or

38

"agreement," and observed that the "gravamen of this case is whether the two mayors had the requisite authority to create special assessment fees on behalf of the city and to waive impact fees." *Id.* at 543 (capitalization omitted). As the starting point for our analysis, we pointed out that municipalities do not possess any inherent powers and are limited to exercising "only those [powers] expressly granted by the Legislature[.]" *Id.* at 543. We identified the "municipal power implicated in this case" as being "the power to impose and waive impact fees." *Id.* at 544.

After pinning down the specific municipal power in question, we noted the limitations imposed on municipal authority to enact taxes and fees as established by the Maryland Declaration of Rights, Article 14, and Section 5 of Article XI-E of the Maryland Constitution. *Id.* at 544. We pointed out that under the express ordinance-making powers enumerated in Section 2 of Article 23A, the General Assembly conferred the authority to establish fees and charges to the *legislative body* of the municipalities. *Id.* at 545. We proceeded to examine the applicable provisions of the Frederick City Charter through the lens of the Maryland Constitution and Article 23A. *Id.* at 544–45. We observed that under the applicable provisions of the charter, the General Assembly's delegation of the express powers was vested in the Aldermen of the City of Frederick. *Id.* at 546. We further determined that, reading the applicable provisions of the Frederick City Charter through the constitutional and statutory prism of Article XI-E and Article 23A, the charter provisions related to the city's power to levy and collect taxes and fees must be undertaken by the City Aldermen pursuant to a legislative act. *Id.* at 547. We noted that the city impact fees had been adopted pursuant to an ordinance of the City Aldermen. *Id.* By implication,

39

we concluded that the fees may only be waived by legislative act. *Id.* We further held that the mayor had neither the authority to levy a special assessment, nor the authority to waive fees that had been legislatively created by ordinance. *Id.*

Despite the mayor's lack of authority to establish or waive fees or assessments under the law, the developer, nonetheless, argued that the city was bound by the contract executed by the mayor—an agent acting on the municipality's behalf. *Id.* We rejected the developer's argument as being inconsistent with this Court's pronouncements dating back to 1869, and reiterated again in *Inlet Associates*, 413 Md. at 433–34, that "acts undertaken by an agent of a municipality, including the Mayor, if not properly authorized, are '*ultra vires*' and therefore invalid." *Id.* at 548 (citing *Horn v. City of Baltimore*, 30 Md. 218, 224 (1869)). Accordingly, we held that, because the mayors who signed the respective agreements lacked the "requisite authority to create a special fee or to waive impact fees[,]" which would have required legislative authorization, which was never obtained, the agreements were *ultra vires* and unenforceable. *Id.* at 549.

The same principles expressed in *Inlet Associates* and *Twigg* apply to the contract sought to be enforced by Hovnanian against the City in this case. Like the contracts in those cases, the fees that Hovnanian seeks to enforce under the Recoupment Agreement were not adopted by ordinance, and as such, the Agreement is *ultra vires* and unenforceable.

## IV

## Conclusion

For the reasons set forth above, the Recoupment Agreement is not a valid and enforceable agreement against the Mayor and City Council. Stripped of its labels, the nature of the governmental action that is the subject of the "agreement" is the imposition and collection of fees, which under Article XI-E, Section 5 of the Maryland Constitution, Local Government Article §§ 5-203(b) and 5-205(d), and the applicable provisions of the Charter, are required to be established by the municipal legislative body known as the "Mayor and City Council of Havre de Grace," pursuant to the enactment of an ordinance. Because the Recoupment Agreement was not adopted by the Mayor and City Council by ordinance, it is *ultra vires* and unenforceable against the City.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. CASE REMANDED TO THE CIRCUIT COURT FOR HARFORD COUNTY FOR ENTRY OF A DECLARATORY JUDGMENT CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY PETITIONERS.**